**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT
3:17-cv-_____**

**BRANDON NELSON CONRAD, M.D.**                                    **PLAINTIFF,**

**v.**

**ANDREW G. BESHEAR, in his official capacity as Attorney General of the Commonwealth of Kentucky; MATTHEW G. BEVIN, in his official capacity as Governor of the Commonwealth of Kentucky; MICHAEL S. RODMAN, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure; and WILL W. WARD, JR., M.D., in his official capacity as Chairman of the Kentucky Physicians Health Foundation**

                                                                  **DEFENDANTS.**
_____

**VERIFIED COMPLAINT**
_____

Plaintiff Brandon Nelson Conrad, M.D. ("Dr. Conrad"), by and through counsel, brings the following Verified Complaint against Andrew G. Beshear ("AG Beshear"), in his official capacity as Attorney General of the Commonwealth of Kentucky; Matthew G. Bevin ("Governor Bevin"), in his official capacity as Governor of the Commonwealth of Kentucky; Michael S. Rodman ("Rodman"), in his official capacity as Executive Director of the Kentucky Board of Medical Licensure ("KBML"); Will W. Ward, Jr., M.D. ("Dr. Ward"), in his official capacity as Chairman of the Kentucky Physicians Health Foundation ("the Foundation"); and their employees, agents, and successors in office:

## **INTRODUCTION**

1. Plaintiff brings this civil action under the United States Constitution, 42 U.S.C. § 1983, and other applicable law to challenge the constitutionality of KRS 311.530, .591, and .592.

1

2. KRS 311.530 created the KBML to regulate, license, supervise, and discipline physicians. This statute sets forth that twelve (12) of the fifteen (15) KBML members are licensed to practice medicine under KRS Chapter 311. Three (3) board members "are not [to be] associated with or financially interested in the practice or business regulated."[1]

3. Pursuant to KRS 311.591 and .592, the KBML board members are empowered to discipline and even take unilateral emergency action to suspend, limit, or restrict the license of a physician.

4. In *North Carolina State Board of Dental Examiners v. Federal Trade Commission*, 135 S.Ct. 1101 (2015), the Court opined that a licensure board that is controlled by "active market participants" but does not receive active supervision by the state violate certain antitrust laws.

5. Notwithstanding the directives of the United States Supreme Court, Defendants have allowed physicians licensed by KBML who are "active market participants" to regulate other physicians who are direct competitors of the regulators.

6. In June 2017, members of Governor Bevin's administration made certain admissions to media outlets that allowing the KBML and other similar boards violated antitrust laws and cited the *North Carolina State Board of Dental Examiners* case. Governor Bevin pledged to implement executive orders to correct the clear conflict that arises when a profession is regulated by active market participants. *See* Exhibit A.

---

[1] This statutory language seems to be a clear acknowledgement that the twelve (12) licensed physicians on the board are "financially interested" in the very practice, trade, and/or commerce that they regulate.

7. Thereafter, AG Beshear made representations to various media outlets that he would initiate litigation to block any executive order from Governor Bevin to reorganize the KBML and other similar boards. *See* Exhibit A.

8. Despite unequivocal knowledge that individuals, such as Plaintiff, would be adversely affected, Defendants have failed to protect licensees from clear violations of antitrust and other relevant laws.

## JURISDICTION AND VENUE

9. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

10. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and by the general legal and equitable powers of this Court.

11. Venue is appropriate under 28 U.S.C. § 1391(b)(1) because Defendants Beshear and Bevin reside and primarily work in this district.

## PARTIES

12. Plaintiff Conrad is a physician licensed to practice medicine in the Commonwealth of Kentucky and is a resident and domiciliary of Lexington, Fayette County, Kentucky.

13. Defendant Bevin is the Governor of the Commonwealth of Kentucky and is sued in his official capacity as the chief executive of the Commonwealth.

14. Defendant Beshear is the Attorney General of the Commonwealth of Kentucky and is the Commonwealth's chief law enforcement officer. Beshear is sued in his official capacity.

15. Defendant Rodman serves as the Executive Director of the KBML and is sued in his official capacity. Defendant Rodman and KBML possess the authority to pursue

disciplinary action, including emergency suspension of licensure, against Kentucky physicians, including Plaintiff.

16. Defendant Ward is a physician licensed to practice medicine in the Commonwealth of Kentucky and serves as the Chairman of the Foundation and is sued in his official capacity. Defendant Ward and the Foundation are contracted with KBML to evaluate healthcare practitioners accused of impairment and are purportedly empowered by KBML to unilaterally compel healthcare practitioners to submit to psychiatric and medical examinations and submit to inpatient substance abuse treatment.[2]

## FACTUAL ALLEGATIONS

17. On or about Friday, March 17, 2017, agents of Ephraim McDowell Regional Medical Center ("EMRMC") notified Dr. Conrad that his hospital privileges were temporarily suspended as a precaution pending a Medical Executive Committee review of his decisions made while treating two patients.

18. On Wednesday, March 22, 2017, during the meeting, Dr. Conrad was asked if he was impaired during the care of the two patients at issue. Dr. Conrad paused to reflect on the question and thereafter responded by asserting that he was not impaired.

19. On Friday, March 24, 2017, Ephraim McDowell Regional Medical Center (EMRMC) notified Dr. Conrad that he was required to submit to an evaluation by the Foundation prior to reinstatement of his hospital privileges.

20. On Wednesday, March 29, 2017, Dr. Conrad submitted to an interview with Dr. Ward of the Foundation.

---

[2] Pursuant to KRS 311.616, KBML has contracted with the Foundation to evaluate and supervise potentially impaired physicians. Each year, the Foundation receives approximately four hundred eighty-four thousand five hundred dollars ($484,500) of taxpayer funding from KBML to provide these services.

21. On April 6, 2017, the Foundation sent a letter to EMRMC that Dr. Conrad would be required to submit to a ninety-six (96) hour psychiatric evaluation at the Florida Recovery Center ("FRC")[3],[4] and was not permitted to return to work until after the evaluation. The letter elaborated that Dr. Ward was "particularly concerned about the rather large number of psychoactive medications" prescribed to Dr. Conrad. *See* Exhibit B.

22. On April 11, 2017, Dr. Beth Housman, Plaintiff's psychiatrist, submitted a detailed written report to the Foundation. Her report noted that Dr. Conrad had been treated at her clinic for three (3) years for attention deficient hyperactive disorder ("ADHD") and anxiety. Dr. Housman specifically wrote:

> Dr. Conrad is not impaired by his psychiatric symptoms in a manner that would interfere with his ability to carry out his responsibilities as a physician. He is not impaired by any medications or by side effects of medications prescribed to address his symptoms. Furthermore, I have routinely obtained KASPER[5] reports, all of which have been consistent with absolutely appropriate use of the medication. *See* Exhibit C.

---

[3] FRC hosts a website which asserts that it is part of the University of Florida system, its employees utilize University of Florida e-mail, and the release for medical records is contained on a University of Florida form to request records from FRC and any other University of Florida location. Shockingly, in response to a request for public records, the University of Florida denied the request citing that FRC is a non-profit organization not controlled by University of Florida.

[4] The Foundation required that Dr. Conrad specifically submit to his evaluation at FRC. Dr. Conrad requested to utilize any of the local Kentucky psychiatric providers to conduct the evaluation; however, the Foundation stood firm in the requirement that FRC was the only provider that could be utilized. Because both FRC and the Foundation have refused to provide their relevant financial information, it is unknown if there is financial incentive for the Foundation to require physicians to attend FRC. FRC requires payment of approximately four thousand dollars ($4,000) for a ninety-six hour evaluation and approximately forty thousand dollars ($40,000) for ninety day inpatient treatment. FRC goes as far to provide information to potential patients that certain lenders provide loans to receive treatment at FRC.

[5] Kentucky All Schedule Prescription Electronic Reporting System ("KASPER") is administered by the Cabinet for Health and Family Services, which tracks prescriptions for controlled substances. KASPER is available to treating healthcare practitioners and

23. Later on April 11, 2017, the Foundation notified Dr. Conrad in writing that a report had been made to KBML that the Foundation was requiring him to submit to the ninety-six hour evaluation.  Later that day, Dr. Conrad notified the Foundation that he intends to submit to the required evaluation. *See* Exhibit D.

24. On May 2, 2017, Dr. Conrad's counsel requested that the Foundation provide any documentation that reflects allegations or findings related to the Foundation's in-house evaluation. Donnette Wolfe, Clinical Coordinator of the Foundation advised that Dr. Conrad was only entitled to his laboratory results and refused to release any other information.

25. The laboratory results released by the Foundation indicated that Dr. Conrad had a therapeutic level of amphetamines in his urine, which stemmed from the routine prescription obtained from his physiatrist, Dr. Housman.  Additionally, Dr. Conrad's phosphatidyl ethanol ("peth") level was detected at 38 ng/mL.[6]  According to numerous

licensure boards for investigative purposes.  The Foundation, which is a separate legal entity from KBML, somehow obtained a KASPER report on Dr. Conrad during the evaluation and used that report as the basis for requiring the ninety-six hour evaluation. KRS 218A.202(7)(a) permits "a board responsible for licensure" to obtain a KASPER report on a person who is the direct target of an investigation, and subsection (g) allows KBML to obtain information on a practitioner who is a partner or associated with a physician under investigation for improper prescribing practices.  KRS 218A.202(9) provides that a person who obtains a KASPER report may not share it with any individual unless that person is authorized to obtain a report under KRS 218A.202(7). Nothing contained in the statue permits the Foundation's physicians to obtain or possess Plaintiff's KASPER report.  Interestingly, the KBML issued disciplinary action against Dr. Bobby A. Miller, II for obtaining a KASPER report on an individual of whom he conducted a forensic psychiatric examination because Dr. Miller did not serve as a treating practitioner of the individual.

[6] Regardless of Plaintiff's peth level, he has not been accused of consuming alcohol while providing patient care, nor has there been any accusation that he suffers from an alcohol addiction.

peer reviewed research, persons with a peth level of less than 20 ng/mL have not consumed any alcohol in the last thirty (30) days. Persons with a peth level greater than 400 ng/mL are chronic alcohol abusers. A peth level at Dr. Conrad's level indicates that he is a mild social consumer of alcohol.[7]

26. On May 9, 2017, Dr. Conrad's former counsel contacted the Foundation and asserted that the requirement of an evaluation stemmed solely from Dr. Conrad's disclosure that he suffered from common mental health ailments (anxiety and ADHD) and that he was prescribed fairly common medications. This communication requested that the Foundation reconsider its requirement that Dr. Conrad submit to the ninety-six hour evaluation. No response was ever received from the Foundation.

27. On May 10, 2017, Dr. Ward of the Foundation sent a letter to KBML acknowledging that he received Dr. Conrad's May 9, 2017, communication. The letter further recited Dr. Conrad's laboratory results and that the Foundation was requiring the ninety-six hour evaluation. *See* Exhibit E.

28. Apparently, KBML treated Dr. Ward's May 10, 2017, letter as a grievance against Dr. Conrad, and initiated an investigation.

29. On May 16, 2017, Dr. Conrad served written notification upon the Foundation that he had scheduled the ninety-six hour evaluation for June 12, 2017.

30. On June 2, 2017, Dr. Conrad met with Kevin Payne ("Payne"), an investigator with KBML. During the investigation, Payne provided Dr. Conrad with Dr. Ward's communication from May 10, 2017. Payne advised that the letter was being treated as a

---

[7] Prior to the requirement that Dr. Conrad submit to toxicology testing at the Foundation, there were no accusations, concerns, or complaints related to his consumption of alcohol.

grievance because the Foundation asserted that Dr. Conrad refused to submit to the ninety-six hour evaluation.

31. On or about June 10, 2017, Dr. Conrad submitted to the ninety-six hour evaluation at FRC.[8]

32. On July 5, 2017, the undersigned filed a request under KRS Chapter 61 with KBML for all records related to Dr. Conrad's investigation. Bertha Wallen, KBML records custodian, denied the request citing KRS 61.878(1)(h). *See* Exhibit F.

33. On July 5, 2017, Dr. Conrad faxed a release of information to the Foundation requesting all of his pertinent records.

34. On July 5, 2017, Dr. Conrad also faxed a request to obtain his medical records from FRC.

35. On July 6, 2017, the undersigned's office contacted the Foundation regarding the release of information. The Foundation asserted that it had received the release of information request and that Dr. Ward would contact the undersigned to discuss the release. Despite the pledge, no records or communication were received.

36. On July 11, 2017, the undersigned's office again contacted the Foundation regarding the medical records. The Foundation advised that Dr. Ward would contact the undersigned and that some records would be sent via facsimile transmission. Despite the pledge, no records were ever received.

37. On July 10, 2017 and July 11, 2017, the undersigned's office left messages with FRC to check on the status of the medical record requests.

---

[8] This evaluation forced Dr. Conrad to expend over four thousand dollars ($4,000) and caused substantial further financial hardship to include the loss of income during his evaluation.

38. On July 10, 2017 and July 11, 2017, the undersigned also contacted Payne via e-mail to request that he provide an update as to the status of the grievance filed against Dr. Conrad and that all relevant documents be produced. No responses were received.

39. On July 12, 2017, the undersigned contacted Rodman via facsimile to again request that the status of the grievance along with documents be provided to Plaintiff. No response was received.

40. On July 14, 2017, Plaintiff received an e-mail from Rodman advising that in a mere three (3) working days, on July 20, 2017, the Inquiry Panel B[9] would consider the grievance filed by Dr. Ward. The communication also stated "there has been a preliminary determination by the Board's legal staff that there is a sufficient legal basis for the issuance of such Emergency Order" which suspends his medical license and that he may appear before the panel to address "why patients or the public would not be endangered by your continuing to practice without restrictions." *See* Exhibit G.

41. On July 14, 2017, the undersigned renewed his request for all documents related to the grievance filed against Dr. Conrad. Despite that request, no response has been received.

42. KRS 311.592 provides that the KBML, in accordance with KRS 13B.125, can take emergency action against a physician's license if the inquiry panel has probable cause to believe "a physician's practice constitutes a danger to the health, welfare, and safety of his patients or the general public, the inquiry panel may issue an emergency order, in accordance with KRS 13B.125, suspending, limiting, or restricting the physician's license."

---

[9] The Board is divided into two six-member panels, A and B, each with the authority to serve as an inquiry panel or hearing panel. KRS 311.591(1). No member of an inquiry panel may serve on a hearing panel concerning the same matter. KRS 311.591(5). *Parrish v. Kentucky Bd. of Medical Licensure*, 145 S.W.3d 401, 405 (Ky. App. 2004).

Furthermore, subsection (2) specifically indicates that the inquiry panel must find "immediate danger to the health, welfare, or safety of patients and the general public" exists.  Likewise, KRS 13B.125 allows emergency action to only be taken when necessary to "stop, prevent, or avoid immediate danger."[10]

43. KBML has been aware of the allegations asserted against Dr. Conrad for at least sixty (60) days. KBML knew that EMRMC referred Dr. Conrad to the Foundation no later than May 10, 2017. Dr. Conrad has complied with the demands of the Foundation by submitting to toxicology testing and the ninety-six hour evaluation which began on June 12, 2017.  Based upon the extended time which has elapsed since the initial allegations, it is impossible for KBML to demonstrate that "immediate danger" is present which warrants an emergency order.[11]

44. There was never any allegation or suggestion that Dr. Conrad performed any patient care while under the influence of impairing substances.

45. It is outrageous and incredibly unfair that KBML has had the leisure to investigate the allegation(s) against Dr. Conrad for more than sixty (60) days.  Payne last interviewed Dr. Conrad more than (40) days ago. Yet provided Dr. Conrad with less than three (3) working days notice of intention to hold an emergency hearing. KBML refuses

---

[10] Normally, there is a Preliminary Inquiry Panel that decides whether there is sufficient evidence to proceed to issue a complaint which is litigated through a hearing governed by KRS 13B. In the instant case, a preliminary inquiry is being conducted to determine whether to issue an emergency suspension.

[11] During the lengthy time period in which KBML have investigated Dr. Conrad, there have been absolutely zero complaints, grievance, allegations, or other adverse commentary purportedly linked to substance abuse issues other than Dr. Ward's bare assertion that he is "concerned" about Dr. Conrad's KASPER report which reflected his prescription issued by Dr. Housman, his psychiatrist.

to provide Dr. Conrad with any semblance of due process, investigation findings or other documents which outline specific allegation(s) are to be considered by the panel.[12]

46. According to the "*Protocol for Handling High Priority Cases*," adopted by KBML on December 19, 2002, "upon receipt of a grievance, the Board's Executive Director will identify high priority cases <u>within five working days</u> that will require expedient investigation and presentation to an Inquiry/Hearing Panel of the Board." *See* Exhibit H. After notification of the Foundation's recommendation, it was not until more than forty-five (45) working days that KBML placed Dr. Conrad's case on the Inquiry Panel B agenda, which seemingly indicates that the case was not actually considered a "high priority."

47. Plaintiff, his counsel, and prior counsel have all made numerous good faith attempts to ascertain the exact allegations in which KBML is investigating and to obtain the information essential to his defense. Despite Plaintiff's good faith attempts, Defendants Rodman and Dr. Ward have refused to provide Plaintiff with any semblance of due process.

---

[12] Aside from the general principals of equity, KRS 61.884 provides that "any person shall have access to any public record relating to him or in which he is mentioned by name . . . ."

48. Based upon Defendants' actions, it appears futile for Plaintiff to exhaust his administrative remedy prior to the initiation of this action.[13],[14]

## COUNT ONE:
## VIOLATON OF FEDERAL ANTI-TRUST LAWS

49. 15 U.S.C. § 2, provides in pertinent part that it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

50. In *North Carolina State Board of Dental Examiners, supra.,* the United States Supreme Court held that a state board controlled mainly by active market participants was not shielded from anti-trust litigation.  In general, the case demonstrated that when active market participants control a state board, they are financially incentivized to discipline other providers or prevent others from entering or remaining in the market or perform regulated activities.   In the case *sub judice,* this state empowered collusion eliminates competition for those board members that are active market participants.

---

[13] Pursuant to KRS 311.555, the judiciary of the Commonwealth shall not review or enjoin actions of KBML until all administrative remedies are exhausted unless: (1) KBML's actions constitute an abuse of discretion, (2) the actions are clearly beyond KBML's legislatively delegated authority, or (3) KBML's actions violate the procedure for disciplinary action as described in KRS 311.591. This tripartite test for administrative decisions requires analysis of whether, *inter alia*, the physician under investigation was provided with adequate procedural due process and whether there was substantial evidence to support the Board's findings of fact. *Parrish,* 145 S.W.3d at 408 (citing *American Beauty Homes Corp. v. Louisville and Jefferson County Planning and Zoning Commission,* 379 S.W.2d 450, 456 (Ky. 1964)). The actions of Defendants in the case *sub judice* clearly demonstrate a denial of procedural due process to Plaintiff. Given that Defendants' dilatory actions indicate the non-emergent nature of the "grievance" against Plaintiff, it is clear that Defendants are purposefully attempting to circumvent the requirement of a KRS 13B hearing required pursuant to KRS 311.591(5).

[14] Because statutory interpretation is a matter of law reserved for the courts, a court reviewing an action by the KBML is not bound by the agency's interpretation of a statute. *Parrish,* 145 S.W.3d at 406.

51. The practice of medicine is commerce and/or trade as contemplated by 15 U.S.C § 2.

52. KBML is almost exclusively controlled by active market participants who are, in essence, business competitors of Plaintiff. The suspension or other adverse action taken against Plaintiff could possibly even cause KBML board members to profit from the action because it will reduce the number of competing physicians.

53. It is the clear intent of members of KBML to monopolize the professional of medicine within the Commonwealth of Kentucky by eliminating competing physicians from the relevant market. If left unrestrained by this Court, there is a substantial risk that KBML's members could effortlessly assert baseless accusations against competing physicians and issue emergency orders to suspend competing physicians to eliminate their competing businesses.

54. The Foundation, empowered by KBML, has conspired with FRC to monopolize psychiatric evaluations of persons accused of suffering from some type of impairment. There are hundreds of qualified healthcare practitioners and facilities that could easily evaluate whether Dr. Conrad suffers from an impairment.[15]

55. Dr. Conrad was forced to expend more than four thousand dollars ($4,000) to compensate FRC for a psychiatric evaluation and additional funds for travelling to Gainesville, Florida.

---

[15] In fact, the Foundation's purported findings are at best ambiguous as to whether Plaintiff suffers from an impairment that has ever or has a reasonable probability of resulting in harm to his patients or the public at large.

56. Additionally, the requirement that the Foundation would only approve of a psychiatric screening from FRC instead of any local or other psychiatric provider constitutes a conspiratorial model to monopolize the commerce of psychiatric screening.

57. The Foundation's attempt to monopolize the commerce of psychiatric screening forced Plaintiff to expend an unreasonable amount of funds and likely receive inferior services in return.

58. If left unrestrained by this Court, the Foundation would likely continue in its unfettered demands for those accused of impairment to submit to only FRC for psychiatric evaluations.  FRC clearly has a financial incentive to recommend and/or require inpatient treatment of those submitting to evaluation because it would stand to gain substantial income as the sole approved provider of substance abuse or impairment treatment of Kentucky healthcare physicians.

59. Pursuant to 15 U.S.C. § 4, the district courts of the United States are empowered to prevent and restrain violations of sections 1 through 7 of 15 U.S.C.

60. Pursuant to 15 U.S.C. § 15, Plaintiff is entitled to recover "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

**COUNT TWO:**
**<u>VIOLATON OF STATE ANTI-TRUST LAWS</u>**

61. Plaintiff adopts all preceding and subsequent paragraphs as if fully restated herein.

62. KRS 367.175(2) sets forth that "it shall be unlawful for any person or persons to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth."

63. The practice of medicine is a trade and/or commerce contemplated by KRS 367.110(2).

64. As recited previously, KBML's board members are primarily active market participants who could financially profit from imposing suspension or other disciplinary action against Plaintiff.

65. Due to the fact that KBML's board members are active market participants, KBML constitutes a monopoly of the trade of medicine within the Commonwealth.

66. The evaluation and treatment of persons accused of impairment is a trade and/or commerce as contemplated by KRS 367.110(2).

67. The Foundation's requirement that Plaintiff submit to FRC and refusal to approve any other medical provider constitutes a conspiracy and monopoly of the trade and/or commerce of evaluation of persons accused of suffering from impairment.

68. KRS 446.070 provides that a person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of this violation, even if a penalty might also be imposed for such a violation.  Pursuant to KRS 446.070 and KRS 411.184, Plaintiff is entitled to compensatory damages, attorney's fees, and an award of punitive damages which exceeds the jurisdictional minimum of this Court.

## COUNT THREE:
## FOURTEENTH AMENDMENT RIGHT
## TO SUBSTANTIVE AND PROCEDURAL DUE PROCESS

69. Plaintiff adopts all preceding and subsequent paragraphs as if fully restated herein.

70. In clear violation of Plaintiff's civil rights, including his right to due process, KBML has refused to provide information and/or documents which sufficiently apprise him of his purported transgressions.  Plaintiff has yet to be provided any specific

allegation of how he is impaired other than a generic statement from Dr. Ward citing that the Foundation was "concerned" about Plaintiff's KASPER report.

71. KBML has refused to allow Plaintiff an adequate opportunity to proffer a defense to the allegations or present evidence in response to the grievance.

72. Notwithstanding that KBML has been investigating the purported grievance against Plaintiff, KBML is now invoking emergency proceedings and only providing three (3) working day notice for the hearing.

73. The plain language of KRS 13B.125 requires a finding of "immediate danger" if the physician is allowed to continue in the practice of medicine. It is impossible for KBML to meet their burden of proof that an emergency order is appropriate.

74. If KBML does issue an emergency order against Plaintiff, KRS 13B.125 commands that the agency provide an emergency hearing within ten (10) days. KBML relies upon 201 KAR 9:240 to govern the emergency hearing proceedings.

75. In contradiction of the clear statutory language of KRS 13B.125 and KRS 311.592, the language of 201 KAR 9:240 deprives Plaintiff of his due process rights.

76. 201 KAR 9:240, Section 5(4), provides "there shall not be a motion practice, prior to or as part of the emergency hearing, relating to the legality or validity of the emergency order under consideration or relating to evidentiary issues."  This administrative regulation seemingly deprives Plaintiff, and other accused physicians, from the ability to contest the validity of an emergency order and the evidenced used against him.

77. 201 KAR 9:240, Section 6(b)(2), allows the KBML to compel testimony of the accused physician; however, subsection (3) only allows cross-examination of the accusing expert witness retained by KBML if "the hearing officer determines on the record that the

physician's evidence has established that one (1) or more factual statements relied upon by the contractual reviewer in the expert report is demonstrably false or incorrect." The requirement that KBML can compel testimony of an accused person may violate Plaintiff's Fifth Amendment protection against self-incrimination. The limit on the ability to cross-examine Plaintiff's accuser potentially violates his right to confront witnesses.

78. 201 KAR 9:240, Section (7)(a)(1) specifically commands that "the hearing officer shall not substitute his or her judgment as to the level of public protection necessary for the emergency order." This regulation explicitly deprives the ability of Plaintiff, or any other accused physician, from prevailing at an emergency hearing on the basis that no emergency exists as required by KRS 13B.125 and KRS 311.592.

79. 201 KAR 9:240, Section (7)(a)(2) places an extreme burden on a hearing panel desiring to revoke an emergency order by requiring "a finding that there is a complete absence of factual basis for the findings." This stringent requirement would make it almost impossible for any accused physician from prevailing at an emergency hearing.

80. If KBML issues an emergency order, the action will be reported to national databases, which will cause Plaintiff irreparable harm. The report to national databases will dramatically increase his cost of malpractice insurance and make it virtually impossible to obtain future employment as a physician.

81. Furthermore, if KBML issues an emergency order, Plaintiff's current business will suffer irreparable harm, inasmuch as employees will be laid off and his business will most certainly cease to exist.

82. KBML's decision to subject Plaintiff to the emergency provisions of KRS 311.592, as described above, violates the right of Plaintiff to substantive and procedural due process, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.[16]

83. Pursuant to 42 U.S.C. § 1983, Defendants are not shielded with immunity normally available to shield governmental actors.

84. Thus, Plaintiff is entitled to injunctive relief to prevent irreparable harm and his reasonable attorney's fees and costs.

**COUNT FOUR:**
**FOURTEENTH AMENDMENT**
**<u>RIGHT TO EQUAL PROTECTION</u>**

85. Plaintiff adopts all preceding and subsequent paragraphs as if fully restated herein.

86. The basis for KBML's adverse actions against Plaintiff is apparently Dr. Ward's March 10, 2017, letter which indicated that he was concerned about Plaintiff's KASPER report.

87. Thereafter, Plaintiff submitted documentation from the psychiatrist who has treated him for more than three (3) years.

88. The treating psychiatrist, Dr. Housman, unequivocally confirmed that Plaintiff suffered from a recognized disability and that the medication identified by the Foundation on the KASPER report was part of Plaintiff's prescribed medical treatments. Dr. Housman further clarified that Plaintiff's medications did not impair his ability to function as a physician.

---

[16] *See Parrish, supra,* at 408 (discussing the fact that judicial review of administrative actions necessarily involves an inquiry into whether the administrative process in question afforded the physician procedural due process).

89. Astonishingly, KBML is proceeding with "emergency" disciplinary action simply because Plaintiff suffers from a disability in which he is prescribed a commonly prescribed ADHD medication.

90. KBML has violated the rights of Plaintiff to equal protection, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, because it subjects Plaintiff to extreme and harsh actions because he suffers from a recognized disability and receives a prescription from his physician.

91. Pursuant to 42 U.S.C. § 1983, Defendants are not shielded with sovereign or other immunity normally available to shield governmental actors.

92. Thus, Plaintiff is entitled to injunctive relief to prevent irreparable harm and his reasonable attorney's fees and costs.

## COUNT FIVE:
## INTRUSION UPON SECLUSION

93. Plaintiff adopts all preceding and subsequent paragraphs as if fully restated herein.

94. Plaintiff has the fundamental right to be free from "intrusion upon seclusion."

95. Plaintiff was entitled to an expectation of privacy with regards to his KASPER report, inasmuch that KRS 218A.202(7) restricts access to an individual's KASPER report.

96. Defendants Rodman and Ward, along with their agents, have conspired to illegally obtain Plaintiff's KASPER report for use by the Foundation.

97. KBML and the Foundation's intentional intrusion upon Plaintiff's private medical records, including his KASPER report, which was clearly an unwarranted and unwanted invasion of Plaintiff's privacy and would be highly offensive to any person.

98. As a result of the intentional intrusion upon seclusion and privacy, Plaintiff suffered and continues to suffer serious harm. Plaintiff is entitled to recover damages from Defendants Rodman and Ward.

### COUNT SIX:
### VIOLATION OF THE AMERICANS
### WITH DISABILITY ACT

99. Plaintiff adopts all preceding and subsequent paragraphs as if fully restated herein.

100. Pursuant to the Americans with Disability Act, 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

101. The basis for Dr. Ward's April 6, 2017, letter was the fact that Plaintiff lawfully and appropriately obtained a prescription for ADHD from his psychiatrist.  Based on the fact that Plaintiff suffered from a disability and obtained a legitimate prescription to accommodate his disability, Dr. Ward compelled Plaintiff to submit to a ninety-six hour psychiatric evaluation at FRC.

102. Thereafter, KBML threatened Plaintiff with emergency suspension or other restriction of his medical license based upon Dr. Ward's "concerns" regarding the medication prescribed to accommodate Plaintiff's disability that appeared on his KASPER report.

103. Defendants Rodman and Ward ignored the report from Plaintiff's treating psychiatrist and are engaging in a campaign aimed to take adverse action against Plaintiff's medical license because of his disability status.

104. As a result of the intentional discrimination, Plaintiff suffered serious harm and is entitled to recover damages from Defendants Rodman and Ward.

## CONCLUSION

**WHEREFORE,** Plaintiff respectfully request that this Court:

A. Issue a temporary restraining order to prohibit Defendant Rodman and KBML from taking any adverse action against Plaintiff's medical license;

B. Enter judgment against Defendants, granting Plaintiff compensatory and punitive damages to the fullest extent of the law;

C. Award Plaintiff costs herein expended including an award of reasonable attorney's fees; and,

D. Such other legal and equitable relief to which Plaintiff may be entitled.

Respectfully Submitted,

COWAN LAW OFFICE, PLC

  \s\ J. Robert Cowan
J. Robert Cowan, Esq.
H. Gera Meyman, Esq.*
2401 Regency Road; Suite 300
Lexington, Kentucky 40503
Telephone: 859.523.8883
Facsimile: 859.523.8885
Email: kylaw@cowanlawky.com
Email: gmeyman@cowanlawky.com
**ATTORNEYS FOR PLAINTIFF**

*Motion to be admitted to Eastern District of Kentucky pending*

## VERIFICATION

After being duly sworn, I attest that I have read the foregoing and it is true and accurate to the best of my knowledge and belief.

**BRANDON NELSON CONRAD**

Sworn to and subscribed before me, the undersigned authority, by **BRANDON NELSON CONRAD** on July 17, 2017.

COMMONWEALTH OF KENTUCKY )
)
COUNTY OF FAYETTE )

Notary Public, State of Kentucky

Identification Number: 581135 .

My Commission Expires: 14 June 2021 .

22