UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

BRANDON NELSON CONRAD, M.D.,      )
                                  )
        Plaintiff,                )        Civil No. 3:17-cv-00056-GFVT
                                  )
v.                                )
                                  )        **MEMORANDUM OPINION**
ANDREW G. BESHEAR, et al.,        )        **&**
                                  )        **ORDER**
        Defendants.               )


                    ***   ***   ***   ***

        Dr. Brandon Nelson Conrad filed the instant action against Defendants Andrew Beshear,

in his official capacity as Attorney General of the Commonwealth of Kentucky, Matthew Bevin,

in his official capacity as Governor of the Commonwealth of Kentucky, the Kentucky Board of

Medical Licensure and its Executive Director Michael Rodman, the Kentucky Committee on

Impaired Physicians, Inc., d/b/a Kentucky Physicians Health Foundation, Inc. ("the

Foundation"), Dr. Will Ward in his official capacity as Chairman of the Foundation, and Dr.

Gregory Jones in his individual and official capacity as Medical Director of the Foundation.  [R.

16.]  Now, this matter comes before the Court upon the Plaintiff's Construed Motion for

Preliminary Injunction.  [R. 4, *see* R. 6.]  Plaintiff requests that the Court issue a preliminary

injunction to prevent the Kentucky Board of Medical Licensure from taking adverse action

against his license to practice medicine in the Commonwealth of Kentucky.  For the reasons

stated below, Dr. Conrad's Motion for Preliminary Injunction [R. 4] is **DENIED**.

                                  **I**

        Plaintiff is a medical doctor that worked as a hospitalist at the Ephraim McDowell

Regional Medical Center ("EMRMC") in Danville, Kentucky. [R. 1 at 4.] On March 17, 2017, the EMRMC removed Dr. Conrad from Patient Care pursuant to the Hospital's "Section 3: Precautionary Suspension" procedures following "concerns about [Dr. Conrad's] recent behavior, deviat[ion] from specialists' orders, and placing patients' safety at risk." [R. 8-4 at 1.] Dr. Conrad was accused of "abnormal or strange behavior" in addition to deviating from a treating pulmonologist's orders, as Dr. Conrad "took approximately two liters of fluid from a patient's lungs" despite contrary orders from the specialist. [R. 15 at 3.] After removing the fluid from the patient's lungs, Dr. Conrad "photographed the fluid . . . posed with it, and texted it." [R. 8-4 at 2.]

In a second patient care situation, Dr. Conrad attempted to revive an 85-year old individual that was "crash[ing]." [R. 15 at 4.] The patient's treating cardiologist had previously issued a standing "do-not-intubate (DNI) order" for medical reasons and because the patient was claustrophobic and "could not tolerate BiPAP, a form of noninvasive ventilation." [*Id.* at 3.] While attempting to revive the patient, and once again in contradiction of a specialist's orders, the Plaintiff placed the patient on BiPAP. [*Id.* at 4.] Following these incidents, Dr. Kryder Vanbuskirk, the President of Medical Staff at Ephraim McDowell, removed Dr. Conrad from patient areas and scheduled a special meeting of Ephraim McDowell's Medical Executive Committee and Peer Review Committee for March 22, 2017, to address the hospital's concerns with Dr. Conrad. [R. 8-4.]

At the special meeting, Dr. Conrad was specifically asked whether he was impaired during these cases. [R. 8-5 at 2.] Plaintiff responded, with some delay, that, "I've thought pretty long and hard about that. I do not believe so. . . I feel comfortable in that answer." *Id.* Following the special meeting, the President of the Ephraim McDowell Medical Staff sent

Dr. Conrad a letter that noted the hospital's concern with Dr. Conrad's apparent hesitation as well as his demeanor and presentation at the meeting. The committee members believed that, during the special meeting, Dr. Conrad's "thought process and ability to clearly articulate medical decision making on such cases was lacking and [his] thought process seemed disconnected at times." [R. 8-5.]

Ephraim McDowell referred Dr. Conrad for evaluation to the impaired physicians program of the Kentucky Physicians Health Foundation, Inc. (the "Foundation"). [R. 1 at 4.] The Foundation "is a private, not-for-profit corporation that merely serves as a contractually designated consultant of the Kentucky Board of Medical Licensure in cases of physician impairment," and is tasked with "provid[ing] recommendations in impairment issues and suggested treatments; it does not make licensing decisions." [R. 15 at 1.] Dr. Will Ward, Chairman of the Foundation's Board of Directors and then Interim Medical Director, interviewed Dr. Conrad on March 29, 2017, reviewed the Plaintiff's version of the patient-care incidents, evaluated his personal health and family history, and determined that Dr. Conrad should submit to a comprehensive ninety-six hour psychiatric evaluation at the Florida Recovery Center before returning to work. [R. 16 at 5-6.]

In an April 6, 2017, letter to Ephraim McDowell, Dr. Ward informed the hospital of his findings concerning Dr. Conrad and, more specifically, noted particular concern with "the rather large number of psychoactive medications reflected on [Dr. Conrad's] KASPER report." [R. 16-5.] In response, Dr. Conrad's psychiatrist, Dr. Beth Houseman, sent a statement to the Foundation on April 11, 2017, that she had treated Dr. Conrad for ADHD and anxiety for three years. [R. 16-6 at 2.] Despite her conclusion that Dr. Conrad "is not impaired by his psychiatric symptoms in a manner that would interfere with his ability to carry out his responsibilities as a

physician" or "by any medication or by side effects of medications prescribed to address his symptoms," Dr. Ward remained concerned with Plaintiff's test results that suggested use of prescribed psychoactive medication in conjunction with alcohol. [*See* R. 16-8.]

Dr. Ward requested confirmation that Dr. Conrad intended to comply with the Foundation's instruction to undergo a 96-hour evaluation at the Florida Recovery Center and made Dr. Conrad aware that the Foundation was required to notify the Kentucky Board of Medical Licensure of this recommendation. [R. 16-7.] Dr. Conrad notified the foundation that he had scheduled the evaluation for May 15, 2017, but Plaintiff also retained counsel and requested reevaluation of the Foundation's 96-hour recommendation. [R. 16 at 7-8; R. 16-8.] Initially, the purpose of this evaluation was to restore hospital privileges for Dr. Conrad at Ephraim McDowell, but the Hospital's subpoena response clarified that Dr. Conrad was employed by InCompass, not by the hospital itself. [R. 8-6 at 2.] Further, and in contradiction of Plaintiff's sworn testimony to the contrary at the Court's August 3, 2017, hearing on this matter, Ephraim McDowell reported that Plaintiff's employer InCompass terminated his employment effective April 1, 2017. [*Id.*]

Dr. Ward's May 10, 2017, letter to the Kentucky Board of Medical Licensure ("the Board") was construed as a grievance and initiated an investigation by the Board. [R.1 at 8; R. 9 at 5 referencing KBML Grievance No. 14095.] The KBML investigator Kevin Payne clarified that the letter was construed as a grievance because the Foundation believed that Dr. Conrad was refusing to participate in a ninety-six hour evaluation. [R. 16 at 8.] Roughly around this same time, Dr. Conrad submitted an "Investigate Physician/Background" document to the Board "in which he indicated that he was not practicing medicine, stating this his primary practice was 'N/A at present'." [R. 9 at 7.] Eventually, Plaintiff was evaluated at the Florida Recovery

Center, but the June 12 through June 15 evaluation produced a report that echoed Dr. Ward's concerns. [R. 8-10.] The Florida Recovery Center found that "co-occurring alcohol use disorder and synergism with Dr. Conrad's other mental health issues might well have contributed to his workplace issues," and recommended that "Dr. Conrad should refrain from practicing medicine as he cannot practice with reasonable skill and safety at this time." [R. 15 at 7-8.]

On July 14, 2017, Mr. Rodman, the Executive Director of the Kentucky Board of Medical Licensure, sent a letter "Re: Potential Issuance of an Emergency Order" to Dr. Conrad concerning substance abuse allegations that advised the Plaintiff that his case would be presented at the July 20, 2017, inquiry panel. [R. 16-10.] The letter also informed Plaintiff that "there is a sufficient legal basis for the issuance of such an Emergency Order, if the Panel decides to issue a Complaint in your case." [*Id.*] Dr. Conrad was invited to address the Panel concerning the single issue of "why patients or the public would not be endangered by your continuing to practice without restrictions while the Complaint is being resolved." Dr. Conrad alleges that it is "outrageous and incredibly unfair" that the Board had more than seventy days to investigate allegations in this matter but that he was provided less than "three working days notice" of the emergency hearing. [R. 16 at 14.] Plaintiff made repeated requests for medical records, updates concerning the investigation, and for documents to be provided but "[n]o response [from the KBML] was received." [R. 16 at 11.] On July 17, three days before the Inquiry Panel was to meet, "for the first time, Plaintiff was provided a copy of certain records from FRC and the Foundation." *Id.*

Plaintiff states that, despite multiple requests, the KBML refused to provide "written notice of the accusations against Plaintiff that were to be considered at the July 20, 2017, hearing" until after the hearing had taken place. [R. 16 at 12.] Plaintiff also alleges that, once he

arrived at the Panel a notice on the door disallowed licensees from distributing materials for consideration as "all evidence must be submitted to the Inquiry Panel seven (7) days prior to the hearing" but Plaintiff was only provided six calendar days of notice. [*Id.*] As a result, "[t]he Inquiry Panel refused to consider the written report of Dr. Allen and the affidavit of Dr. Houseman because it was not submitted seven (7) days prior to the hearing." *Id.* Even with this "arbitrary seven (7) day rule" the Panel allowed Mr. Payne, the KBML investigator, to submit a "Panel Memorandum" six days prior to the July 20 hearing. [R. 16 at 13.]

At the Inquiry Panel, Dr. Conrad testified that he last practiced medicine in March 2017 and he confirmed that he had not practiced since working as a hospitalist at Ephraim McDowell Hospital. [R. 9 at 9-10.] The Panel made a charging decision that resulted in an emergency suspension of Plaintiff's license to practice medicine but provided Plaintiff with an opportunity to enter into an "Interim Agreed Order (Treatment), pursuant to which he would agree to not practice medicine until he either" underwent a ninety (90) day inpatient treatment program or completed an additional ninety-six (96) hour inpatient evaluation at a board approved facility. [*Id.*]

Simultaneous to many of these events, Plaintiff filed the instant 42 U.S.C. § 1983 action against Defendants and has alleged multiple statutory and Constitutional violations in the Complaint [R. 1] and Amended Complaint [R. 16]. First, Dr. Conrad alleges that the Kentucky Board of Medical Licensure violates Federal and State Anti-Trust laws. [R. 16 at 15-20.] Next, he believes that the KBML licensure revocation process violated his Fourteenth Amendment rights to substantive and procedural due process. Dr. Conrad also alleges defendants violated his Fourteenth Amendment right to equal protection as an individual that suffers from a recognized disability and one that is charged with meeting the definition of a "chronic and persistent

alcoholic." [R. 16 at 25.] Finally, Dr. Conrad brings suit for intrusion upon seclusion and alleges that the Defendants have violated the Americans with Disability Act for, among other things, threating emergency suspension of Dr. Conrad's medical license due to his medically diagnosed and treated ADHD. [R. 16 at 27.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involv[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it")). To issue a preliminary injunction, the Court must consider: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction. *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).

Further, a court need not consider all of the factors if it is clear that there is no likelihood of success on the merits. *See Amoco Protection Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). The Court of Appeals clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired*

*Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012)). Even if the Plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

While all Defendants have replied to Plaintiff's Motion for Preliminary Injunction, only the Kentucky Board of Medical Licensure has the authority to revoke or reinstate Dr. Conrad's medical license. The initial complaint only named Michael Rodman, the Executive Director of the KBML, as a party to this action [R. 1 at 1], but the Amended Complaint added the Kentucky Board of Medical Licensure. [R. 16 at 1.]

## A

First, the Court must consider "whether the movant has shown a strong likelihood of success on the merits. *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). As mentioned before, since the Plaintiff seeks a preliminary injunction to prevent or mitigate a violation of his Constitutional rights, "the likelihood of success on the merits often will be the determinative factor." *Schimmel*, 751 F.3d at 430 (6th Cir. 2014). The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Sixth Circuit has recognized the Kentucky Board of Medical Licensure as a state agency. *See Quatkemeyer v. Kentucky Bd. of Med. Licensure*, 506 F. App'x 342, 346 (6th Cir. 2012).

**1**

Plaintiff primarily alleges failure by the Kentucky Board of Medical Licensure to provide adequate procedural and substantive due process while determining whether to revoke his medical license. [*See* R. 16 at 20-21.] More specifically, Dr. Conrad believes that the pre-deprivation hearing was inadequate, the statutory framework and evidentiary presumption produce "stringent requirement[s]" that "make it almost impossible for any accused physician. . . [to prevail] at an emergency hearing," and since Board members are active market participants, the Board is violating federal and state antitrust law. [*Id.* at 15-21.] Since the Sixth Circuit has recognized that medical doctors have a property interest in retaining medical privileges, the question before the Court is "whether the plaintiff was provided with sufficient notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *See Benjamin v. Brachman*, 246 F. App'x 905, 914 (6th Cir. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

Plaintiff argues that the administrative action taken by the Kentucky Board of Medical Licensure is not "rationally related to a legitimate government interest." [R. 4-1 at 7.] Despite Plaintiff's assertion, the Supreme Court has repeatedly held that "[t]here can be no doubt the government has an interest in protecting the integrity and ethics of the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)). The Court has not only held regulation of the medical profession to be proper, but unique state interests exist in the context of licensing professionals. Defendant Rodman and the Kentucky Board of Medical Licensure cite to *Barry v. Barchi*, 443 U.S. 55 (1979), to support this proposition. [*See* R. 9 at 12.]

In *Barchi*, the Supreme Court determined that the New York State Racing and Wagering

Board, which licenses horse trainers and establishes regulations for those trainers, could suspend a trainer's license that was protected by the Fourteenth Amendment's Due Process Clause without a pre-deprivation hearing. *Barchi*, 443 U.S. at 63 (1979) (The regulatory scheme "does not affront the Due Process Clause by authorizing summary suspensions without a presuspension hearing. . ." even though the trainer "had a property interest in his license sufficient to invoke the protection of the Due Process Clause.") Despite the fact that a positive drug test triggered a rebuttable evidentiary presumption that the trainer had improperly engaged in horse doping, the statute did not run afoul of the Constitution, in part because the established statutory procedures were properly followed and "they sufficed for the purposes of probable cause and interim suspension." *Id.* at 66.

The Kentucky Board of Medical Licensure was established as an independent board by the Kentucky legislature to provide for and regulate medical and osteopathic licensure. Ky. Rev. Stat. Ann. § 311.530; *see also* Ky. Rev. Stat. Ann §§ 311.530-311.620, 311.990. The Kentucky Legislature tasked the Board with initial licensing and continuing oversight of the practicing physicians in the Commonwealth. Ky. Rev. Stat. Ann. §§ 311.595, 311.597. In the instant action, Dr. Ward's May 10, 2017, letter to Mr. Rodman, the Executive Director of the Kentucky Board of Medical Licensure, detailed Dr. Conrad's referral to the Foundation, his retention of counsel, and request for a reevaluation of Dr. Ward's initial recommendation. [*See* R. 16-8.] This letter was construed as a grievance, pursuant to Ky. Rev. Stat. Ann. § 311.591(2), and resulted in the initiation of an investigation by the KBML. [*See* R. 9 at 5.]

On July 14, 2017, Mr. Rodman sent a letter to Dr. Conrad, "Re: Potential Issuance of an Emergency Order," notifying him that the investigation was ready for presentation to the Inquiry Panel and that the next panel would meet on July 20, 2017. [R. 16-10.] Mr. Rodman's letter

states that the Panel will determine whether the "factual allegations constitute a violation . . . that would warrant the issuance of a Complaint," and "[i]f a Complaint is warranted, an evidentiary hearing will be scheduled to determine if a violation has been committed, and at that time you will be afforded due process." [R. 16-10 at 2.] Also, at that time, the Inquiry Panel has the authority to issue an emergency order, which would "suspend[] your license until the Complaint is finally resolved…" [*Id.*] Dr. Conrad was informed that the legal staff had determined there to be a "sufficient legal basis for the issuance of such an Emergency Order" therefore, the sole issue Plaintiff could address before the initial Inquiry Panel concerned "why patients or the public would not be endangered by your continuing to practice without restrictions while the Complaint is being resolved." [R. 16-10 at 2.]

Plaintiff alleges deprivation of due process because of the three working day notice provided to him concerning the Inquiry Panel's consideration of an emergency suspension order. [R. 16 at 14.] But, the Supreme Court has held that a professional's license may be suspended without a presuspension hearing, *Barry v. Barchi*, 443 U.S. 55 (1979), and the Kentucky Legislature has authorized the agency to "take emergency action . . . without a hearing . . . to stop, prevent, or avoid an immediate danger to the public health, safety, or welfare." Ky. Rev. Stat. Ann. § 13B.125(1)-(2). Notably, well before the July 20, 2017, hearing, the Florida Recovery Center had performed a 96-hour evaluation of Dr. Conrad and had concluded, consistent with Dr. Ward's initial findings, that "Dr. Conrad should refrain from practicing medicine as he cannot practice with reasonable skill and safety at this time." [R. 8-10.] Were the Inquiry Panel to issue an emergency order, KRS 13B.125(3) allows the aggrieved party to demand an emergency hearing that must be held within ten working days of the party's request. Then, within five working days of holding the emergency hearing, the agency must "render a

written decision affirming, modifying, or revoking the emergency order." Ky. Rev. Stat. Ann. § 13B.125(3).

The agency or hearing officer must be qualified, *see* Ky. Rev. Stat. Ann. § 13B.040, and will uphold the order "if there is substantial evidence of a violation of law which constitutes an immediate danger to the public health, safety, or welfare." *Id.* Plaintiff argues that the standard of review for emergency orders deprives him of due process because the hearing officer must find that there is "a complete absence of factual basis for the findings" to determine that substantial evidence fails to support the inquiry panel's findings of fact. 201 KAR 9:240. While difficult to overcome, this burden creates a presumption in favor of the emergency order and prevents the hearing officer or panel from "substitut[ing] its judgment for that of the charging panel as to the weight of the evidence on questions of fact or the appropriate amount of protection unless the licensee rebuts the evidence upon which the presumption is based." [R. 9 at 13, citing KRS 13B.150(2).]

In *Barchi*, the Supreme Court held that "given the rebuttable nature of the 4120.5 presumption, the high standard of accountability is not unconstitutional." *Barry v. Barchi*, 443 U.S. 55, 62 (1979). Similarly, in the instant action, "the findings of fact in the emergency order shall constitute a rebuttable presumption of substantial evidence of a violation of law that constitutes immediate danger to the health, welfare, or safety of patients or the general public." Ky. Rev. Stat. Ann. § 311.592. Following emergency review, an order by the hearing officer or panel would constitute a final agency decision that could be appealed to the Jefferson Circuit Court pursuant to KRS 13B.140. Ky. Rev. Stat. Ann. § 13B.125(4). Emergency orders are temporary and, even if upheld, the order would only remain in effect until the KMLB resolves the complaint. [R. 9 at 4.]

Defendants KBML and Mr. Rodman argue that the statutory process, as well as the administrative regulations adopted to carry out emergency orders, hearings, and appeals, are congruent with the protections provided by the United States Constitution and provide adequate due process for Plaintiff to fairly and meaningfully challenge the revocation of his medical license. [*See* R. 9 at 14, referencing the KBML's regulation 201 KAR 9:240.] If Dr. Conrad were to challenge the Inquiry Panel's finding at an emergency hearing he would be entitled to present evidence, make oral or written statements, and present any number of records to rebut the evidentiary presumption. *See* 201 Ky. Admin. Regs. 9:240; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (explaining that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances"). Further, if Dr. Conrad chose to appeal the final agency decision, the Kentucky state courts have jurisdiction to determine whether constitutional or statutory violations have occurred. Ky. Rev. Stat. Ann. § 13B.150; *but cf.* Ky. Rev. Stat. Ann § 311.555 (A statute that restricts the Kentucky judiciary from interfering with the KBML's actions unless the Board abused its discretion, acted beyond its legislative delegated authority, or violated procedures described in KRS 311.591.).

Dr. Conrad argues that the Constitution protects a physician's right to practice his or her profession, and that this right cannot arbitrarily be denied. [R. 4-1 at 9.] Both the Supreme Court and Sixth Circuit "have long held that the freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by the State." *Benjamin v. Brachman*, 246 F. App'x 905, 918 (6th Cir. 2007) (quoting *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir.1989)). But, it appears that Dr. Conrad's recent licensure review was initiated for reasons that are far from arbitrary and Plaintiff fails to cite to case law or factually similar precedent that might suggest the KBML process is improper.

Rather than capricious or irrational, these administrative proceedings were reasonably initiated following serious complaints concerning Dr. Conrad's patient care while he was employed as a hospitalist at Ephraim McDowell Regional Medical Center in Danville, Kentucky. Upon referral for evaluation by the impaired physicians program at the Kentucky Physicians Health Foundation, Dr. Will Ward demonstrated concern for Dr. Conrad and recommended further treatment at the Florida Recovery Center. There, after an exhaustive 96-hour evaluation, the FRC found that Dr. Conrad lacked the ability to practice medicine "with reasonable skill and safety at this time." [R. 8-10.]

This Court is poorly situated to second guess the medical diagnoses of multiple healthcare professionals or to determine Dr. Conrad's competency to practice medicine. Even so, the processes Dr. Conrad was afforded to this point and the procedures that remain to be exercised suggest that Plaintiff has received sufficient notice of the KBML's investigative process and he has "the opportunity to be heard at a meaningful time and in a meaningful manner." *See Benjamin v. Brachman*, 246 F. App'x 905, 914 (6th Cir. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Further, Plaintiff will be afforded the opportunity to meaningfully challenge the KBML's conclusion in Jefferson Circuit Court once a final decision has been rendered by the Board. At this early stage of litigation, Plaintiff's due process claims do not appear likely to succeed on the merits. *See Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002).

**2**

Dr. Conrad also alleges that the statutory framework establishing the Kentucky Board of Medical Licensure and the Board Membership violate state and federal antitrust laws because the panel members tasked with licensure decisions are active market participants. [R. 16 at 15-20.]

15 U.S.C.A. § 2 states that it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce among the several States."  Similar Kentucky anti-trust provisions also make unlawful the attempt to monopolize trade in the Commonwealth.  *See* Ky. Rev. Stat. Ann. § 367.152(2).  The KBML is comprised of fifteen members "including the commissioner of public health, the dean of the University of Kentucky College of Medicine, the vice dean for clinical affairs of the University of Louisville School of Medicine, the dean of the University of Pikeville School of Osteopathic Medicine, and eleven (11) members appointed by the Governor."  Ky. Rev. Stat. Ann. § 311.530. The eleven Governor appointees are comprised of: one licensed osteopathic physician (from a list of nominees submitted by the Kentucky Osteopathic Medical Association), seven licensed medical physicians (from a list of nominees submitted by the Kentucky Medical Association), and three citizens at large that are "not associated with or financially interested in the practice or business regulated."  *Id.*

Recently, the United States Supreme Court issued a ruling in *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101 (2015), which addressed a similar licensure board in North Carolina.  In *Bd. of Dental Examiners*, the eight person Board of Dental Examiners (of which six must be licensed dentists) responded to dentist complaints concerning the increasing number of nondentists that were providing teeth whitening services for lower cost.  *Id.* at 1108. The chief operations officer of the Board remarked "that the Board was 'going forth to do battle' with nondentists."  *Id.*  The Board determined that teeth whitening constituted "the practice of dentistry" and unilaterally issued 47 cease-and-desist letters to providers that were not licensed dentists.  *Id.* at 1108.

The Federal Trade Commission (FTC) challenged the Board's conduct alleging that the

Board had violated antitrust law and the Court of Appeals affirmed the FTC's administrative process and findings. *N. Carolina Bd. of Dental Examiners*, 135 S. Ct. 1101, 1109 (2015). Upon review, the Supreme Court determined that the Board of Dental Examiners violated antitrust law and was not entitled to state action immunity as the Board members were active market participants and the Board itself was not subject to active supervision by the state. *Id.* at 1117. Plaintiff argues that, similarly, market participants in the KBML have a pecuniary interest in revoking or suspending the licenses of practitioners in the state of Kentucky and their conduct violates antitrust law. [*See* R. 4-1 at 10.]

At the time the KBML initiated proceedings against Dr. Conrad, the KBML believed that Dr. Conrad was not practicing medicine. [R. 9 at 7 (Dr. Conrad submitted an Investigative Physician/Background to the KBML and indicated his primary practice was N/A at present.)] Therefore, Plaintiff's assertion that the KBML members were "financially incentivized" to discipline Plaintiff lacks merit. [R. 4-1 at 9.] In fact, the Kentucky Board of Medical Licensure was unaware that Dr. Conrad was certified to prescribe Suboxone or that he had operated an addiction recovery clinic since June 2017 until the testimony of Kelly Jo Bartlett and Plaintiff at the hearing concerning this motion. [*See* R. 28.]

More precisely read, *Bd. of Dental Examiners* holds that licensure Boards may be comprised of market participants but that state action immunity requires for the anticompetitive conduct to be actively supervised by the State. *See N. Carolina Bd. of Dental Examiners*, 135 S. Ct. 1101 (2015). The Court established two requirements for a nonsovereign actor controlled by active market participants to receive *Parker* state action immunity: "first that the challenged restraint . . . be one clearly articulated and affirmatively expressed as state policy, and second that the policy be actively supervised by the State." *Id.* at 1110 (quoting *FTC v. Phoebe Putney*

*Health System, Inc.*, 133 S. Ct. 1003, 1010 (2013).

The Kentucky Board of Medical Licensure has a clear directive from the "declared policy of the General Assembly of Kentucky" to regulate and control the practice of medicine "to protect the health and safety of the public. Further, The General Assembly of Kentucky has created the board, as defined in KRS 311.530, to function as an independent board…" Ky. Rev. Stat. Ann. § 311.555. Second, the Board is authorized to "promulgate reasonable administrative regulations" but these regulations undergo a public notice and comment period and require legislative approval. [KRS 311.565; R. 9 at 16.] Also, unlike the Board of Dental Examiners, the KBML is unable to unilaterally proceed against unlicensed individuals. Rather, the Board must seek enforcement of an injunction against unlicensed individuals through the Kentucky court system. Ky. Rev. Stat. Ann. § 311.605.

*N. Carolina Bd. of Dental Examiners*, 135 S. Ct. 1101, 1106 (2015), is also distinguishable from the instant action as, unlike the Board of Dental Examiners, the KBML did not seek to prevent forty-seven non-licensed individuals from practicing medicine. Rather, here, the KBML was responding to individual complaints lodged against Dr. Conrad that directly concerned the quality of medical care he provided and his ability to safely treat patients. *Cf. N. Carolina Bd. of Dental Examiners*, 135 S. Ct. 1101, 1106 (2015) (noting that of the complaints filed with the Board of Dental Examiners, "[f]ew complaints warned of possible harm to consumers. Most expressed a principal concern with the low prices charged by nondentists.") Following the *Bd. of Examiners* Supreme Court Opinion, the FTC issued "Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants" and suggested regulatory boards could continue to take action against individual licensees without risk of violating antitrust laws. *See id.* (Oct. 2015) ("FTC Guidance") ("Note that a

disciplinary action taken by a regulatory board affecting a single licensee will typically have only a de minimis effect on competition. A pattern or program of disciplinary actions by a regulatory board affecting multiple licensees may have a substantial effect on competition.")

Plaintiff has failed to present any evidence that suggests the Kentucky Board of Medical Licensure has acted against multiple licensees in a way that has a substantial effect on competition. Instead, Plaintiff's sole complaint is that the structure of a regulatory board that includes market participants is de facto unconstitutional. Without further evidence of anti-competitive behavior, Dr. Conrad is unlikely to succeed on the merits of a federal or state antitrust claim, as the Board's actions against Dr. Conrad were initiated due to health and safety concerns and disciplinary action against an individual licensee would only have a de minimis effect on competition.

**3**

Plaintiff also asks this Court to consider the KBML's stare decisis concerning the last five years of disciplinary orders issued by the Board. [R. 4-1 at 10.] Plaintiff's counsel argues that in situations involving Adderall or alcohol, he is unable to locate a KBML "adverse action against a licensee for consuming a lawful and appropriate prescription for ADHD, or for social alcohol consumption that did not interfere with patient care." [R. 4-1 at 11.] Defendants do not respond to this argument, possibly because Plaintiff's argument is irrelevant at the preliminary injunction stage as it does not go towards showing "a strong likelihood of success on the merits." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002).

Beyond the use of Adderall, as prescribed, or the legal consumption of alcohol, Dr. Conrad was referred to the Foundation because of "concerns of a potential impairment that could be affecting his decision making abilities while on duty." [R. 16-5 at 1.] Ephraim McDowell

referenced "two patient care situations wherein [Dr. Conrad] ignored the specialist's recommendations and/or orders and proceeded to treat patients in contradiction of those orders." [R. 8-4 at 1.] Plaintiff posed with, photographed, and texted pictures of fluid that had been removed from a patient. *Id*. Also, Dr. Conrad was accused of "abnormal or strange behavior in recent weeks." *Id.*

Plaintiff does not provide the Court with previous licensing decisions that were issued by the KBML nor is this Court well equipped to perform the KBML's duty of determining whether a physician is mentally and physically capable of providing competent healthcare. Regardless, this argument does not support the Plaintiff's likelihood of success and the briefing conveniently fails to discuss a number of complicating factors.

## B

Next, the Court must determine "whether the movant will suffer irreparable harm if the injunction is not issued." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Id.* at 578 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992)). Since Dr. Conrad has failed to demonstrate that his constitutional rights have been violated, he is not entitled to a presumption of irreparable harm. *See Overstreet*, 305 F.3d at 579 (6th Cir. 2002).

Plaintiff practices medicine and operates an addiction clinic that he will be forced to close if his license is revoked. [R. 4-1 at 12.] Plaintiff continues to argue that the Board members could realize a pecuniary benefit from this license revocation, and that they are attempting to "monopolize the practice of medicine," as his practice closure may drive his patients to seek the medical services of a KBML board member. [R. 4-1 at 12.] But, as previously stated, the Board

believed that Dr. Conrad was neither practicing medicine nor employing individuals in a private practice. [R. 9 at 17, R.8-8, R. 8-13.] The Court must determine whether the harm suffered by Plaintiff will be "immediate and irreparable . . . absent injunctive relief." *Abney v. Amgen, Inc.*, 443 F.3d 540, 551 (6th Cir. 2006). Here, Plaintiff will not be irreparably harmed by the loss of his practice, as his loss is purely economic, calculable, and could be recovered through monetary damages. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) (quoting *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir.1995) (holding that "[t]he loss of a job is quintessentially reparable by money damages"); *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Dr. Conrad cites to *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) to argue that, absent a preliminary injunction, he would suffer irreparable harm by "depriv[ing] him of business opportunities…" [R. 4-1 at 12.] In *Doran*, a group of bar owners argued that they "would suffer a substantial loss of business and perhaps even bankruptcy" if they were not able to enjoin enforcement of a newly passed town ordinance that prohibited topless dancing in bars. *Doran*, 422 U.S. at 932 (1975). But, the Supreme Court requires district courts to "weigh carefully the interests on both sides." *Id.* at 931. Unlike the bar operators that sought to attract patrons through the use of topless dancers, the Kentucky Board of Medical Licensure is furthering its state mandated duty "to protect the health and safety of the public" by regulating and controlling the practice of medicine. Ky. Rev. Stat. Ann. § 311.555. Despite the Court's conclusion in *Doran* that economic injury can result in "unnecessary and substantial irreparable harm," the factual predicate underlying the Supreme Court's conclusion is so vastly different from the instant action that the Plaintiff's comparison is inapposite. Also, inherent in a regulatory scheme where licenses can be revoked by emergency order is the Legislature's

understanding that pecuniary harm will almost certainly befall the physician whose license is forfeited.

Plaintiff also argues that irreparable harm will be suffered if the emergency order by the Board is reported to a national healthcare database as malpractice insurance providers monitor these databases and will increase premiums to unaffordable rates.  [R. 4-1 at 16.]  Yet, this type of calculable economic injury is quite unlike the historic home facing a wrecking ball, as monetary damages or other forms of corrective relief can make the Plaintiff whole.  *See Sampson v. Murray*, 451 U.S. 61, 88 (1974) (stating that "the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") *Sampson v. Murray* clarifies that

> The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* at 90.

Defendants were unaware of Dr. Conrad's private practice and believed that he had not practiced medicine since March 2017, therefore revocation of his medical license would not result in financial harm.  [*See* R. 13 at 5.]  But, Plaintiff will certainly suffer financial harm if his license is revoked.  Aside from the ability for traditional remedies to restore the status quo ante, the Court is persuaded by Defendants' argument that Plaintiff assumed the risk of this hazard as Dr. Conrad chose to establish a medical clinic and renew the practice of medicine while the KBML was actively investigating his conduct and ability to practice medicine.  Nevertheless, since Plaintiff has failed to "demonstrate that irreparable injury is likely in the absence of an injunction," this second factor weighs against the issuance of a preliminary injunction.  *Winter v.*

*Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

C

Finally, the Court must determine: "3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction." *Overstreet*, 305 F.3d at 573 (6th Cir. 2002). Plaintiff argues that the requested injunction would not harm others and that the public interest is served by preventing a violation of constitutional rights. [R. 4-1 at 13.] Since the Court has already determined that his constitutional rights are not likely being violated, this argument is unpersuasive. Further, members of the public could be harmed were this Court to prevent the Kentucky Board of Medical Licensure from revoking or suspending the license of a physician that may not be fit to practice medicine.

The KBML is authorized by the General Assembly to take action against physicians for a number of reasons including chronic or persistent alcoholism and hospital "removal, suspension, [or] limitation." Ky. Rev. Stat. Ann. § 311.595. Ephraim McDowell's suspension of Dr. Conrad, Dr. Ward's initial evaluation, and the Florida Recovery Center's comprehensive report all suggest that Dr. Conrad may be suffering from a combination of factors that impair his ability to practice medicine. The Florida Recovery Center concluded that he "cannot practice with reasonable skill and safety at this time until his alcohol use disorder is addressed." [R. 8-10.] Accordingly, it is reasonable to infer that injunctive relief could result in harm to members of the public were Dr. Conrad to continue treating patients.

III

The Court remains unpersuaded that this case presents one of the extraordinary circumstances that require the issuance of a preliminary injunction. "A preliminary injunction is

22

an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). Here, the Plaintiff has failed to do so. While the Court has determined that Dr. Conrad is not entitled to the requested injunctive relief, this does not necessarily suggest Plaintiff's claims lack merit. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Brandon Nelson Conrad's Construed Motion for Preliminary Injunction [**R. 4**] is **DENIED**; and

2. By subsequent order, the parties shall be required to conduct a meeting and report pursuant to Federal Rule of Civil Procedure 26(f).

This the 11th day of August, 2017.

Gregory F. Van Tatenhove
United States District Judge